******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BTS, USA, INC. *v.* EXECUTIVE
PERSPECTIVES, LLC, ET AL.
(AC 37502)

DiPentima, C. J., and Sheldon and Mullins, Js.

*Argued March 14—officially released June 28, 2016*

Appeal from Superior Court, judicial district of Waterbury, Complex Litigation Docket, Dubay, J. [motion to inspect]; Dooley, J. [motions for order, and attorney's fees, costs; judgment].)

*James T. Baldwin*, with whom, on the brief, were *Catherine L. Creager* and *Douglas J. Varga*, for the appellant (plaintiff).

*Joseph D. Garrison*, with whom were *Joshua R. Goodbaum* and, on the brief, *Robert A. Richardson*, for the appellees (defendants).

*Opinion*

SHELDON, J. The plaintiff, BTS, USA, Inc., appeals from the judgment of the trial court rendered in favor of the defendants, Executive Perspectives, LLC (EP), and Marshall Bergmann, on its claims against them for violation of the Connecticut Uniform Trade Secrets Act (CUTSA); General Statutes § 35-50 et seq.; and the Connecticut Unfair Trade Practices Act; General Statutes § 42-110a et seq.; and tortious interference with the plaintiff's business relationships, and on its claim against Bergmann for breach of his employment contract with the plaintiff and against EP for tortious interference with that employment contract. On appeal, the plaintiff claims that the court abused its discretion by (1) precluding it from inspecting an adequate sampling of EP's products; (2) determining that the name and identity of the plaintiff's vendor was not a trade secret; (3) denying its request for injunctive relief; (4) finding that it had maintained its CUTSA claims in bad faith; and (5) awarding attorney's fees to EP without distinguishing the fees associated with its colorable claims from the claims found to have been made in bad faith. We affirm the judgment of the trial court.

The following facts, as found by the trial court,[1] are relevant to this appeal. "[The plaintiff] is part of a Swedish based international corporation which designs and markets training simulations, experiential educational exercises and related products to business and industry. The products include business simulations designed to educate and train client employees, whether upper management, middle management or front office workers. There are essentially three types of product[s]: learning maps, computer simulations, and board games. The products can be sold 'as is' or they can be customized to varying degrees. As needed, a simulation can be designed almost from scratch to suit the specific model or needs of the client. The president of [the plaintiff] is Jonas Akerman.

"EP is a direct competitor of [the plaintiff]. EP designs and sells the same types of product to the same types of clients, with the exception of learning maps. EP does not have any learning map type products in its inventory. It does however have both computer simulations and board game products. EP can also sell product 'as is' or can customize the product to whatever extent is necessary to meet the needs of the client. Although a direct competitor of [the plaintiff], EP is much smaller than [the plaintiff]. The president of EP is John Wells.

"EP has been in business since 1983. EP has changed names and has changed hands a few times over the years but in 2004, John Wells and John Thomas (both cofounders of the company in 1983) reacquired the business and all of its assets. The court credits the testimony of Wells that throughout its existence, EP's

simulation technology has gone largely unchanged and relies in large measure on the original technology acquired in 1983. Although it has expanded with time, the inventory of products has been unchanged, for the most part, since approximately 2009. EP has always had the ability and the manpower to customize its simulations. EP has had board game simulations in its inventory for many years. EP has not created any new products or simulations since approximately 2009.

"The court further finds, crediting the testimony of Wells and the documentary evidence offered by the defendants, that as of the filing of this lawsuit, most of this information was known to [the plaintiff]. In 2008, [the plaintiff] considered acquiring EP. As a result, subject to a confidentiality and nondisclosure agreement, [the plaintiff]'s financial advisors and [the plaintiff] were given access to much of EP's proprietary information. EP disclosed details of its corporate structure; personnel; sales history; client information; capabilities; liabilities and other information pertinent to a determination as to whether it was a good prospect for acquisition. During this time, Wells and Akerman had discussions about EP's capabilities to include the scope and range of its customization ability. Ultimately, [the plaintiff] determined not to proceed.[2]

"Marshall Bergmann was employed by [the plaintiff] from 2005 until mid-June, 2010. He was a senior director at the time he left. As such, he had access to much of [the plaintiff]'s proprietary information and was involved in many of the proprietary processes, i.e., product pricing . . . [of the plaintiff]. When Bergmann began work . . . [for the plaintiff], he signed an employment contract which contained a number of restrictions, to include a noncompete clause upon his departure. Material to the plaintiff's claim that the contract was breached by Bergmann and/or interfered with by EP are the following provisions:

" '2.1 Employee shall not for a period of two (2) years immediately following the end of the Employee's active duties with Employer, either directly or indirectly, either for himself or for any other person, company or other business entity:

" 'a. Make known or otherwise make available to any person, company, and/or other business entity the names and addresses of any clients (whether the corporate entity or the individuals employed by such corporate entity) of Employer or any other information pertaining to them;

" 'b. Call on, solicit, or take away, or attempt to call on, solicit, or take away or communicate in any manner whatsoever, with any of the clients of Employer;

" 'c. Call on, solicit, or take away, or attempt to call on, solicit, or take away or communicate in any manner whatsoever, with any of the clients of Employer on

behalf of any business which directly competes with employer.

" '2.2 For the purposes of this Agreement, clients shall be defined as any person, company or other business entity whom the Employer has performed work or services for, solicited business and/or collected monies from, with the twelve month period immediately preceding the end of the Employee's active duties with the Employer.'

"While [working for the plaintiff], Bergmann was involved in an effort to do business with the Royal Bank of Canada (RBC). Ultimately, RBC decided not to do business with [the plaintiff] and decided to give the business to a Canadian business school. RBC turned down [the plaintiff]'s offer in June, 2010. Prior to 2010, RBC was not a client of [the plaintiff]. [The plaintiff] had not previously done any business with RBC.

"Also in June, 2010, Bergmann accepted a job offer from EP to work in its New York office. He gave two weeks' notice to [the plaintiff]. He did not tell [the plaintiff] that he was going to work for a competitor. Bergmann testified that he did not take any contact lists, client lists, vendor lists or other . . . . information with him when he left. This testimony is credited. Further, Wells testified that Bergmann did not share [the plaintiff's] client lists, client information, technology, product information, pricing strategies or other proprietary information. Nor did EP solicit any such information from Bergmann upon his arrival or at any time thereafter. This court finds Wells' testimony credible.

"Shortly after he began work at EP, Bergmann posted his new job to his LinkedIn account. Those to whom he was 'linked' on this social media could have received a notification of this posting. Whether a 'linked' individual received notice of the posting or not would depend on the particular settings selected by that person. One of the tasks given Bergmann when he joined EP was to improve and revamp the EP website, which he did. Upon completion he posted an invitation to 'check out' the new website via his LinkedIn account. Some of the individuals to whom Bergmann was 'linked' were clients and contacts he had developed while [working for the plaintiff]. He did not 'unlink' these people when he left [the plaintiff's employ]. He was not asked to do so. He never had any discussions with anyone at BTS about his LinkedIn account. In fact, many people [employed by the plaintiff] have similar LinkedIn accounts and are still linked to Bergmann.

"Shortly after he began work at EP, Bergmann contacted Liz Carreiro and Jan Wilmott, both of whom worked at RBC. Carreiro and Wilmott were the contacts at RBC Bergmann dealt with when trying to sell the [plaintiff's] product/project shortly before his departure

from [its employ]. He had known Jan Wilmott for years, to include a time when Wilmott did not work at RBC. In his correspondence, Bergmann advised RBC that he had taken a new job with EP and he attempted to meet with and discuss EP's capabilities for possible business in the future. The correspondence was clearly designed to get business with RBC for EP, something readily acknowledged by Bergmann in his testimony. The correspondence also included some comparisons between EP and [the plaintiff], which were unfavorable to [the plaintiff] as well as some arguably disparaging comments about [the plaintiff]. The communications did not contain any proprietary information belonging to [the plaintff] and did not make reference to any such information. Ultimately, RBC did not do any business with EP. In fact, to date, RBC has done no business with EP. Bergmann's last correspondence or contact with RBC occurred in November, 2010.

"Conversely, after Bergmann left [the plaintiff's employ], Akerman maintained regular contact with RBC. [The plaintiff] continued in discussions with RBC and in 2013, sold RBC an education/training product. During that process, [the plaintiff] initially quoted a particular price to RBC. RBC responded that the price was too high. As a result, [the plaintiff] developed different options by which RBC could obtain the same result or objective but which would be less costly. The product was scaled back in some respects in order to achieve these cost savings. Ultimately, RBC chose one of the options developed by [the plaintiff]. This option was $73,000 less expensive than the originally quoted product proposal. [The plaintiff] provided the work/product to RBC and to this day enjoys a good business relationship with RBC. . . .

"While at EP, within two years of his arrival, Bergmann was assigned to work in the field at Hewlett Packard (HP). He did not solicit HP and did not have any role in securing the business of HP. He was merely assigned to help deliver the product. HP was a client of [the plaintiff] as well, though Bergmann never did any work for HP while he was [employed by the plaintiff]. HP remains a client of [the plaintiff], and there was no evidence that Bergmann's work on the HP project included the use of any [of the plaintiff's] proprietary or confidential information. Nor was there evidence offered that Bergmann's work on the HP project had any adverse impact on [the plaintiff] or its relationship with HP.

"Richard Kelly is one of EP's independent contractors in Australia. He is also a former employee of BTS, Australia, Inc. Kelly left BTS Australia in February, 2009. After he left BTS Australia, he went to work for a firm called AJ Lucas. While at AJ Lucas, he had discussions with BTS Australia about BTS Australia providing a product/training exercise to AJ Lucas. In connection

with those discussions, BTS Australia gave Kelly a 'participant kit' for one of its learning map products called 'Conductor.' The kit was contained within a cardboard box, which was designed to look like a large envelope. It also bore artwork specific to the Conductor game. Kelly, individually or on behalf of AJ Lucas, was not asked to enter into a confidentiality agreement with respect to the participant kit. He was not advised that either the box or its contents were proprietary or that they were not to be shared with anyone else. Although AJ Lucas ultimately determined not to do business with BTS Australia, no one at BTS Australia asked Kelly to return the participants kit or the box in which it was housed. In sum, the box and the kit were given away by BTS [Australia] to AJ Lucas as a potential client without any restrictions. When Kelly left his employment with AJ Lucas, he took the box and the participant kit home.

"In 2010, Kelly contacted EP about possible employment opportunities. He was hired as an independent contractor for marketing and sales of EP's inventory of products in Australia. Also in 2010, EP was thinking about changing its packaging for one of its board game products, 'Takeoff,' and perhaps 'Wild Fire,' as well. During a discussion on this issue, Kelly advised EP that the box used by [the plaintiff] might be of interest. Thereafter, he took a photograph of the outside of the 'Conductor' box he had received when he was at AJ Lucas and sent the photographs to EP. EP then did a mock-up of its own art work for a similar style box. Bergmann advised EP that Ironwood Lithographers was the vendor that [the plaintiff] used for its packaging. He gave Kelly Snider, at EP, the name of Jay Topczewski as a point of contact at Ironwood and told her to mention his name as the reference. [The plaintiff's] employees, to include Bergmann, were never told that vendor names are proprietary and not to be shared. Bergmann's employment contract, which contained a lengthy description of information deemed 'confidential,' did not include the names of vendors as subject to its non-disclosure provisions.

"Snider contacted Topczewski by e-mail to inquire about a quote for packaging. She sent the EP mock-up as well as the photographs of the 'Conductor' participant kit box. Topczewski did not believe that he could or should be using the [the plaintiff's] packaging as a base design for EP. He declined to do business with EP and advised [the plaintiff] of his interactions with EP.

"All of the events which purport to comprise the tortious conduct complained of occurred in the latter six months of 2010. And notwithstanding these events, [the plaintiff] continues to enjoy an excellent and ongoing business relationship with Ironwood; RBC changed from being a prospective client of [the plaintiff] to an actual client; RBC and [the plaintiff] enjoy an ongoing

business relationship; RBC never gave any business to EP; EP has done no business with Ironwood; EP never changed its 'Take Off' or 'Wildfire' packaging."[3] (Footnotes altered.)

On the basis of these factual findings, the court concluded: "With these facts found, it is manifest that the plaintiff's evidence is so lacking that the determination that the plaintiff has failed in its burden of proof is completely unremarkable."[4] (Footnote altered.) The court further found that the "[p]laintiff's theory of damages is factually and legally unfounded." The court thus rendered judgment in favor of the defendants on all five counts of the plaintiff's complaint. The court also found that the plaintiff's CUTSA claim, although "colorable at the outset, portions of it became objectively specious shortly into the discovery process," and thus that the plaintiff's insistence in maintaining certain of those claims was motivated by improper purposes. Pursuant to General Statutes § 35-54, on the basis of that determination, the court awarded attorney's fees to EP in the amount of $171,203.40.[5] This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the trial court abused its discretion in not permitting it to inspect an adequate number of EP's products to ascertain whether EP had misappropriated trade secrets. We disagree.

The following factual and procedural history is relevant to this claim. On May 7, 2012, the plaintiff served upon the defendants a request for inspection seeking to have its expert witness inspect six of EP's products, namely: "[The following] computer simulations of the defendant [EP] with regard to the (a) user interface, (b) programming language and (c) the processing methodology (including a demonstration by an operator designated by [EP] for each: (1) 'Go Figure—Financial Services'; (2) 'Strategic Horizons'; (3) 'Oil & Gas Perspectives'; (4) 'Business Perspectives.' [In addition, these] board simulations/learning maps of [EP]: (1) 'Wildfire' [and] (2) 'Take-off for Teams.' "

On May 14, 2012, the defendants filed an objection to the plaintiff's request to inspect in which they argued, inter alia, that: "Undeterred by the mountain of evidence which contradicts [the] plaintiff's speculation, the plaintiff now seeks to accomplish its major objective in this [litigation—to acquire] [EP]'s trade secrets. With no solid evidence to rest upon, the plaintiff has filed a motion to inspect [EP]'s important secret products and capabilities. [The] plaintiff seeks access to the computer programming language that [EP] uses to operate its products, as well as [EP]'s processing methodology. [The] plaintiff seeks access to these essential trade secrets, even though the evidence clearly shows that the products [the] plaintiff wants to inspect *all* predated

Bergmann's hire." (Emphasis in original.) The defendants addressed each of the products that the plaintiff sought to inspect, giving reasons as to why the plaintiff's request to inspect should be denied, and emphasized that the plaintiff already had received discovery that supported the defendants' claims and concluded that: "[T]his must be the point in this litigation where [EP]'s essential trade secrets are deemed worthy of protection from its competitor. This should be especially so where the evidence which supposedly justifies the disclosure or inspection of such trade secrets is totally lacking. Mere speculation and unsupported allegations should never allow access to competitive trade secrets."

On May 18, 2012, the plaintiff filed a reply to the defendants' objection to its request to inspect EP's products, arguing that the defendants' objection was actually a motion for protective order and thus that the defendants had the burden to "demonstrate that disclosure of allegedly confidential information will work a clearly defined and very serious injury" to their business. (Emphasis omitted; internal quotation marks omitted.) The plaintiff argued that the defendants had completely failed to meet this burden and that the parties had already established measures to protect their trade secrets by agreeing to a general protective order.

On May 24, 2012, the court, *Dubay*, *J.*, held a hearing on the dispute surrounding the plaintiff's request to inspect EP's products at which counsel for the parties presented oral argument. The court ordered, inter alia, the parties to submit proposed orders regarding their respective positions on the parameters of any inspection to be conducted of EP's products, including the scope of the inspection and the identity of an expert to conduct said inspection. After receiving the parties' proposals, the court issued an order on June 19, 2012, that the plaintiff and EP each name an expert and that those two experts confer to agree upon a neutral expert to conduct the inspection. The court ordered that if the parties could not come to an agreement in that regard, that the parties would submit names of proposed experts to the court and that it would appoint a neutral expert to conduct the inspection; that said expert would abide by the protective order previously agreed to by the parties. As to the scope of the inspection, the court ordered: "The defendants are to provide the neutral expert with all documentary, electronic and physical information, and/or access to said information or individuals with that information, for the purpose of conducting an inspection of up to twenty percent (20%) of the product offerings of [EP] listed in plaintiff's motion to inspect dated May 14, 2012. The choice as to which products to be inspected shall be within the sound discretion of the neutral expert." The court further ordered: "Upon the conclusion of the inspection, the neutral expert shall prepare and issue an interim report designated 'Attorney's Eyes Only' directed to counsel

for the parties. The report shall state in sufficient detail, but without disclosing proprietary information belonging to [EP] or [the plaintiff] the neutral expert's findings with regard to the neutral expert's review of each of the products, whether there is a significant similarity between the products of [EP] and [the plaintiff] and, if there is a similarity, whether the similarity is significant enough to give rise to an inference of misappropriation of [the plaintiff]'s products by [EP], or whether additional inquiry by the neutral expert is warranted in order to make such determination."

The plaintiff thereafter sought clarification of the court's June 19, 2012 order, specifically as to the number of EP's products the court was permitting the neutral expert to inspect.[6] The court held a hearing on the plaintiff's motion for clarification on July 6, 2012. Primarily, the plaintiff sought clarification as to whether the court intended the inspection to encompass 20 percent of EP's entire product line, which equated to approximately six products, or 20 percent of the six products that the plaintiff listed in its request to inspect. At the hearing, the court clarified that its order was that the plaintiff could inspect 20 percent of the products that it had listed in its request, not 20 percent of EP's entire product line. Upon hearing the court's clarification, the plaintiff made an oral motion for reconsideration of the scope of the inspection to include more than 20 percent of the six products it had listed in its request for inspection as that figure would equate to only one product. The court explained to counsel for the plaintiff: "I know that you believe that the scope of the audit is insufficient and it may not serve your purpose for . . . it certainly doesn't give you what you sought. However, in this case, I was very close to finding that an insufficient showing had been made to allow any discovery whatsoever, which was the position that was urged upon me by [counsel for the defendants]; that essentially the plaintiff had not made any showing in this case which should allow a raid of [20] percent of the work product of the defendant. And so . . . I decided that 20 percent of 20 percent, or 4 percent is better than zero percent." The court permitted the parties to file posthearing memoranda on the plaintiff's motion to reconsider. On July 19, 2012, the court reaffirmed its June 19, 2012 order.

The parties thereafter reached an impasse in choosing a neutral expert to conduct the inspection, and the court thus issued an order on August 28, 2012, naming said expert, Francois Thrower. Thrower conducted his inspection and on January 2, 2013, issued his report, wherein he explained: "It is now abundantly clear to me that a broader review of EP products is necessary to assess the likelihood that the products of EP are copies or derivative works of [the plaintiff's] products." Thrower opined that the inspection of the court-permitted singular product "is simply too few products to

determine if there are sufficient similarities in products and whether technology and know-how have been misappropriated." Thrower noted that he reviewed two versions of EP's "Wildfire" product. He did not, however, set forth any findings regarding that inspection. Rather, Thrower explained that a review of "both computer and noncomputer-based products including generic and customized examples is required." He thus requested "as a starting point" to inspect all six of the products identified in the plaintiff's May 14, 2012 request for inspection.

On January 8, 2013, the plaintiff filed a motion for order seeking to inspect the products identified by Thrower in his report. The defendants filed an objection to that motion, arguing, inter alia, that Thrower had not, on the basis of his inspection of Wildfire, determined that they had stolen the plaintiff's trade secrets, but, rather, Thrower was simply seeking to expand the scope of the inspection to obtain more information to make that determination. Thrower did not opine as to Wildfire's similarity, or lack thereof, to any of the plaintiff's products. The court, *Dooley*, *J.*, held a hearing on the plaintiff's motion and the defendant's objection on February 13, 2013, at which the plaintiff presented the testimony of Thrower. Thrower testified that, upon being appointed to conduct the inspection in this case, he first met with the plaintiff to familiarize himself with their products. Following that meeting, but before meeting with EP to review its product, he sent an e-mail to the parties stating that "it was not possible for me to render a complete judgment without having a broader access to both sides' products." He testified that he was aware that the court had issued an order allowing the inspection of only one of EP's products, which he was permitted to choose, but that he had reviewed seventeen of the plaintiff's products and wanted to "make a similar kind of comparison with EP's products." Thrower testified that he had chosen to inspect Wildfire because he had learned from the depositions of Wells and Bergmann that the packaging of Wildfire had been a source of contention between the parties. On the basis of his inspection, Thrower testified that he could say with a reasonable degree of certainty that there were no similarities between Wildfire and any of the plaintiff's products. Despite that conclusion, however, Thrower testified that he did not have enough information to conclude that none of EP's products are, as the plaintiff's counsel stated, "remarkably similar" to any of [the plaintiff's] products. On that basis, the plaintiff asked the court to expand the scope of the inspection to permit Thrower to inspect more of EP's products.

On February 15, 2013, the court denied the defendant's motion for order seeking to inspect additional EP products. The court explained: "It appears to this court that granting the plaintiff's motion for order so as to allow the further inspection by Mr. Thrower of

[EP]'s products would necessarily require this court to revisit and undo the prior determination of Judge Dubay. The question[s] of whether, how and to what extent [EP]'s products would be inspected by a court-appointed expert were thoroughly and aggressively litigated before Judge Dubay. The outcome of that litigation is contained in the court's order dated June 19, 2012, as clarified by order dated July 19, 2012. The court permitted a very limited inspection, which could potentially be expanded if the initial limited inspection, by virtue of its findings, gave rise to such an expansion. Mr. Thrower determined that [EP]'s product chosen for inspection had absolutely no similarity to any of the plaintiff's products. Thus, by virtue of the court's prior determinations, no further inspection is warranted. This court gives 'law of the case' deference to these prior orders. . . . The fact that Mr. Thrower determined not to follow the court's directive and simply render an opinion as to the single product chosen, and chose instead to request greater access so that he might make a more informed judgment does not change the analysis. It was for the court, following input from both parties, to determine the scope of the expert's assignment and the role he might play in the litigation. His desire to play a different role or to expand the scope of his assignment is not reason, at this juncture, to revisit or change Judge Dubay's decision."

On appeal, the plaintiff claims that the court abused its discretion in permitting it to inspect only one of EP's products because the defendants failed to show good cause to limit the plaintiff's discovery request pursuant to Practice Book § 13-5. Our Supreme Court has stated, "We have long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed. . . . That ample discretion is limited, however, by the provisions of the rules [of practice] pertaining to discovery; Practice Book §§ 217–221 [now §§ 13-2 through 13-5]; especially the mandatory provision that discovery *shall* be permitted if the disclosure sought would be of assistance in the prosecution or defense of the action. . . . The [party] opposing . . . retains the ability [however] to object to such requests by any number of procedural vehicles, including written objection, motion to quash, motion to limit, or motion for a protective order. See Practice Book § 13-5 . . . . The court, in its discretion, may grant or deny such objections as it deems appropriate." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Brody* v. *Brody*, 153 Conn. App. 625, 637–38, 103 A.3d 981, cert. denied, 315 Conn. 910, 105 A.3d 901 (2014).

Here, on the basis of the arguments of the defendants, the court determined that it was limiting the scope of the inspection on the basis of the weakness of the

plaintiff's argument that the allegations of their complaint were based upon anything more than mere speculation. Although the plaintiff claims that the court abused its discretion in limiting the scope of its inspection of EP's products, it has not challenged as erroneous the basis for the court's limitation on that inspection, the court's determination that the plaintiff's request for inspection was based upon speculative allegations of the misappropriation of trade secrets. On the basis of the defendants' arguments that the plaintiff's allegations were based solely upon speculation, the court remarked that it was very close to denying the request for inspection altogether. On the basis of the court's finding in this regard, the court acted well within its discretion in limiting the scope of the inspection.

The plaintiff also claims that the court abused its discretion in deferring to Judge Dubay's limitation of the scope of the inspection as "the law of the case." "The law of the case doctrine provides that [w]here a matter has previously been ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance." (Internal quotation marks omitted.) *Mazier* v. *Signature Pools, Inc.*, 159 Conn. App. 12, 28, 123 A.3d 1, cert. denied, 319 Conn. 933, 125 A.3d 207 (2015). Here, it is clear from the court's explanation of its denial of the plaintiff's motion for order permitting the inspection of additional EP products that the court found that Judge Dubay had correctly decided the plaintiff's earlier, heavily litigated request to inspect EP's products and the objection filed by EP and that no new or overriding circumstance had arisen that would form the basis for an expansion of that order. Thus, the plaintiff's claim that the court abused its discretion in this regard also must fail.

## II

The plaintiff next claims that the trial court erred in determining that the name and identity of the plaintiff's vendor was not a trade secret. We disagree.

"The question of whether information sought to be protected by [CUTSA] rises to the level of a trade secret is one of fact for the trial court. . . . [When] the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the

entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling. . . .

"With respect to what constitutes a trade secret, the meaning of that term is set forth at General Statutes § 35-51 (d). Under that statutory subsection, trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. General Statutes § 35-51 (d)." (Citations omitted; internal quotation marks omitted.) *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 220–21, 919 A.2d 421 (2007). Accordingly, to make out a prima facie case for a violation of CUTSA, the plaintiff was required to present sufficient evidence that, if believed, would prove that its "vendor information consisting of the unpublished name and e-mail address of the vendor representative . . . Topczewski," had independent economic value and that the plaintiff made reasonable efforts to maintain the secrecy of his identity.

Here, the trial court found: "The plaintiff also failed to establish that the name of the vendor who makes the packaging is a trade secret. [The plaintiff's] employees, to include Bergmann, were never told that vendor names are proprietary and not to be shared. Bergmann's employment contract, which contained a lengthy description of information deemed 'confidential,' did not include the names of vendors as subject to its nondisclosure provisions. The fact that Bergmann told Snider to use his name further supports the conclusion that Bergmann was under no obligation to keep [the plaintiff's] vendor names secret. Ironwood was identified as a partner of [the plaintiff's] predecessor in interest, The Real Learning Company, in that company's website. Ironwood has no contractual obligation or understanding with [the plaintiff] that it must keep its status as the [the plaintiff's] box maker a secret. [The plaintiff] discloses Ironwood as its printer/vendor on those occasions that Ironwood is required to speak directly to the client or on those occasions when Ironwood ships the product directly to the client.

"In the face of this evidence, [the plaintiff] offers only the testimony of Akerman that the box and vendors' names are trade secrets. This is not sufficient.

"Furthermore, [the plaintiff] failed to establish that either the box or the vendor name was misappropriated or obtained through 'improper means.' BTS Australia gave the box to Kelly when Kelly worked for AJ Lucas.

It did so without restriction of any sort. It required no confidentiality agreement; did not request its return and never told Kelly the box (or even its content) were proprietary or not to be shared. Kelly, who was not even an employee of EP at the time, was under no obligation or duty to maintain the box's secrecy. He took it home, where it stayed. Months later, when Kelly worked for EP, he took a picture of the outside of the box and sent it to EP. [The plaintiff] offers no evidence to contradict these facts. Nor does [the plaintiff] offer a cogent explanation as to how EP's possession of the photograph of the outside of the box can be the result of 'misappropriation' under these facts.

"Similarly, for the same reasons that the vendor identities cannot be considered trade secrets, their use or disclosure cannot constitute misappropriation. Bergmann was not under any duty to maintain the secrecy of the vendor's identities. The names were therefore not obtained through improper means, and their use by EP was not misappropriation."

The plaintiff claims that the trial court erred in focusing on the identity of Ironwood, versus the "unpublished personal contact information for Topczewski"—that "[t]he trial court erred when it failed to address the evidence as to the vendor contact information and instead referenced evidence that the identity of Topczewski's employer, Ironwood, was not confidential as a basis for its determination that [the plaintiff]'s vendor information is not a trade secret." The plaintiff argues, "The vendor, Ironwood, does not publish Topczewski's name or e-mail address; therefore, EP could have obtained his name and e-mail only through Bergmann."

The court's determination that the names of the plaintiff's vendors did not constitute trade secrets logically encompasses the employees of those vendors. The fact that EP discovered Topczewski's identity and e-mail address from Bergmann does not demonstrate that Bergmann was the only way that that information could have been obtained, that that information had any independent economic value, or that either the plaintiff or Ironwood itself had taken measures to maintain the secrecy of that information. On the basis of the record before us, we cannot conclude that the court erred in determining that the plaintiff's "vendor contact information" was not a trade secret under CUTSA.

### III

The plaintiff also claims that the trial court improperly denied its request for injunctive relief under General Statutes § 35-52 (a). We disagree.

The trial court found: "Alternatively, the plaintiff seeks injunctive relief. CUTSA does allow for the granting of injunctive relief, in appropriate cases, in addition to or in lieu of damages . . . § 35-52 (a). However, nor has [the] plaintiff established that injunctive relief

is appropriate.

"Bergmann left [the plaintiff's employ] over four years ago. The last act by Bergmann which is even arguably a CUTSA violation occurred in November, 2010. If, *arguendo*, the RBC solicitation was considered a CUTSA violation, it was done without malice or improper intent; it was isolated in nature; it caused no harm to [the plaintiff]; and it has not been repeated. There is no evidence or indication that Bergmann or EP have done anything wrong since that time, and no indication that Bergmann or EP intend to use any of [the plaintiff]'s confidential information into the future. . . . Thus, absent any actual damages or cause for injunctive relief, the CUTSA claim premised upon the RBC solicitation also fails." (Citation omitted; internal quotation marks omitted.)

Our standard of review of a trial court's denial of a request for injunctive relief is well settled. "The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Internal quotation marks omitted.) *Stamford* v. *Ten Rugby Street, LLC*, 164 Conn. App. 49, 73, A.3d (2016).

Section 35-52 (a) provides: "Actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction. An injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."

The plaintiff claims that the trial court improperly denied its claim for injunctive relief on the basis of three allegedly erroneous factual findings. First, the plaintiff argues that "the defendants have a continuing duty not to use the plaintiff's existing trade secrets." Second, the plaintiff claims that "a finding of malice or improper intent is not required for injunctive relief." Third, the plaintiff contends that "a finding of threatened misappropriation, not actual, is required for injunctive relief." We need not address the plaintiff's arguments in depth, as each of those grounds is easily dispatched by the trial court's determination that the plaintiff had presented no evidence whatsoever of any wrongdoing by either of the defendants in the past, any intended wrongdoing in the future, or any harm stemming from any alleged wrongdoing. The plaintiff's claim that the trial court erred in denying its request for injunctive relief is thus without merit.

IV

The plaintiff next claims that the trial court erred in finding that it had maintained its CUTSA claims in bad faith.[7] We disagree.

In determining whether the plaintiff's CUTSA claims were maintained in bad faith, the trial court set forth the following additional facts. "[The plaintiff] initially claimed that Kelly misappropriated board game technology and processes. This claim was made largely due to Akerman's suspicions that Kelly had done so. Those suspicions purportedly arose out of the coincidental timing regarding Kelly's departure from [BTS Australia] and EP's addition of board games to its advertised inventory. Specifically, Akerman said EP began advertising board game product on its website in January, 2009, the same time Kelly had left [BTS Australia] to go to EP. Therefore, Akerman suspected and assumed that Kelly misappropriated board game trade secret information and gave it to EP in January, 2009. However, not long after this litigation began, that these premises were factually flawed came to light. First, EP has had board game technology and advertised such (to include on its website) for many years prior to 2009. Second, Kelly did not leave [BTS Australia] in January, 2009. He left in February, 2009. Kelly did not go to EP from [BTS Australia] and had no contact with EP until January, 2010. In the interim, he worked for AJ Lucas. Further, the evidence established the [the plaintiff] was fully aware that Kelly did not leave until February, 2009, and that he did not pursue employment with EP at that time. Indeed, after he left BTS Australia, he discussed a potential business transaction between AJ Lucas and BTS Australia.

"An additional purported justification for pursuing these claims was Akerman's suspicion that Bergmann had also shared product technology with EP. This suspicion turns out to be equally flawed and wholly incredible. Akerman claimed that EP did not have the capacity to provide 'level 2' customization to its simulation products until Bergmann began working at EP. Therefore, he reasoned, Bergmann must have shared that technology and processes with EP. However, as found above, throughout its existence, EP has had the ability to customize product to whatever extent was necessary in order to meet a client's needs. A review of the EP website going back many years confirms this testimony. Further, as already found above, [the plaintiff] was fully aware of EP's ability to perform 'level 2' customization of its simulations as a result of the information provided by Wells and EP during the 2008 due diligence. The information disclosed by EP during that due diligence included the extent to which EP's work involved customization and the time value of its customization business. Again, Akerman's stated 'suspicions' as justification for this lawsuit were not well founded, could have been debunked with a modicum of due

diligence and in fact, are not credible.[8]

"Akerman further testified that in 2010, when it was brought to his attention that EP had contacted Iron-wood and appeared to have a 'Conductor' participant kit, he became further concerned or suspicious of EP. However, soon into the litigation, [the plaintiff] knew that the box had been given to Kelly by [BTS Australia] without restriction, while he was at AJ Lucas. [The plaintiff] was provided chapter and verse as to the circumstances under which the Conductor box and kit came into Kelly's possession. [The plaintiff] has never developed any evidence that the kit itself was ever seen or used by EP. Indeed, EP still has no learning map type of product in its inventory.

"Nothwithstanding [the plaintiff]'s actual knowledge of when Kelly left, the complete debunking of the assumptions about Kelly, and [the plaintiff]'s knowledge that EP could in fact customize its product before 2010, [the plaintiff] continued to seek extraordinary discovery in this case to include all of EP's product technology.[9] The court (*Dubay, J.*), recognizing the dearth of evidence to support [the plaintiff]'s suspicions, ordered a very limited review, by a court-appointed expert, of a single EP product. The expert found no evidence of any similarity between the EP product chosen by [the plaintiff] and any of [the plaintiff]'s products. The court (*Dooley, J.*) thereafter determined that no justification existed for a further intrusion by [the plaintiff] into EP's products or product technology.

"On the first day of trial [the plaintiff] advised EP and the court that the CUTSA claim would be limited and would not include any claim that EP misappropriated product technology. [The plaintiff] did not concede that no evidence existed to support the claim, but rather, blamed the court's ruling restricting access to EP's products, as the reason that it was unable to prove its suspicions regarding EP. Notwithstanding [the plaintiff]'s pronouncement on the first day of trial, EP has offered voluminous testimony and evidence that no such misappropriation occurred. It d[id] so not to disprove the plaintiff's case, but to advance its own claim that the CUTSA action was brought and maintained in bad faith.

"EP's claim that the CUTSA count was advanced in bad faith relies largely on the utter dearth of evidence, as outlined above, to support the initial allegations of product technology misappropriation. [The plaintiff] responds that the lawsuit was only commenced after a series of events which gave rise to grave concern regarding Bergmann and EP, to wit: Bergmann did not tell [the plaintiff] he was going to a competitor; [the plaintiff] learned that Bergmann was at EP; Bergmann contacted RBC within weeks of joining EP (conduct which [the plaintiff] believed violated the employment

agreement); Ironwood was contacted by EP and [the plaintiff] learned that EP had what appeared to be a participant kit for one of its learning map products; EP requested a similar packaging design to the one used by [the plaintiff] for Conductor. Under these circumstances, [the plaintiff] argues it had legitimate reason to believe Bergmann was sharing [the plaintiff's] proprietary information and trade secrets.

"This court agrees that at its inception, the plaintiff had a colorable CUTSA claim. [The plaintiff] had received sufficient information to give rise to an inference that EP was in possession of [the plaintiff's] trade secrets and pursuing the how and the extent of the situation through this litigation was not bad faith on the part of [the plaintiff]. However, not far into the discovery process, it was abundantly clear that the product technology claim had no merit. All of [the plaintiff]'s suspicions or concerns regarding product technology misappropriation should have been adequately laid to rest by the end of 2011. By then, it was abundantly clear that EP had not modified nor added to its technology or product inventory since approximately 2009, long before Kelly and Bergmann joined EP. This was made clear to [the plaintiff] through discovery requests; deposition testimony; and responses to document requests.

"Further, Akerman's factual assumptions and suspicions regarding Kelly were fully debunked by then. Kelly was not hired by EP until 2010, and EP had board games long before Kelly was hired. To the extent that the participant kit for 'Conductor' raised concerns, it was also clear that EP does not have and has never had a learning map type of product. Conductor is a learning map product. For [the plaintiff] to maintain these claims after the discovery process made crystal clear that the very premises upon which his suspicions were purportedly based were factually inaccurate gives rise to an inference that the litigation was maintained for improper purposes. Indeed, to date, aside from factually flawed premises and the unfounded suspicions of Akerman, [the plaintiff] has offered no explanation for persisting in its claim of product technology misappropriation.

"In sum, no later than end of 2011, there was simply nothing left to justify or explain [the plaintiff]'s persistence in pursuing the CUTSA claims as to product technology. [The plaintiff]'s quest to obtain EP product technology through discovery and court process, after their claims were laid bare as meritless, gives rise to an inference of improper motive on the part of [the plaintiff]. The court finds that [the plaintiff]'s determination to maintain the product technology CUTSA claims as of the end of calendar year 2011 and through to the first day of trial was made in bad faith as that term has been defined by our appellate courts. The court will

hear evidence as to the attorneys fees incurred defending these claims during that time period.

"The claim that the Conductor box was a trade secret and was misappropriated was, as found, wholly without merit. Akerman's testimony, if believed, might have established that the packaging was considered a trade secret, thus making this claim 'colorable' at the inception of the litigation. However, in light of the circumstances under which the box and its content came into Kelly's possession, i.e., it was given to him by [the plaintiff] without restriction while he was employed at AJ Lucas, the claim of 'misappropriation' as defined by CUTSA was demonstrably false and no longer 'colorable' upon those circumstances coming to light. Maintaining such a claim, under those circumstances, amounts to bad faith. Those circumstances were known to [the plaintiff] (if not before commencement of the litigation) certainly by the end of 2011. The court will hear evidence as to the claimed attorney's fees incurred defending this claim after that date and through trial.

"The claim that the vendor names and contact information, specifically, Ironwood, was a trade secret was supported by scant evidence. However, Akerman did testify that the information is presently not available to the public and that [the plaintiff] does not advertise or share openly its vendor's identities. While the court found the evidence lacking in terms of the plaintiff's burden, it was not a claim 'without color.'

"The claim that the RBC solicitation involved the misappropriation of a trade secret was also, throughout the litigation, a colorable claim. While the court has found that the solicitation itself did not include the use of trade secrets such as pricing information, RBC was a potential client of [the plaintiff]; was an entity [the plaintiff] had tried to do business with and clearly hoped to do business with in the future. Wilmott and Carreiro were client contacts developed by Bergmann while [working for the plaintiff]. Both Wells and Akerman agree that potential clients and current clients can be proprietary in nature and can be and often are considered trade secrets. To the extent that Bergmann was under a duty not to disclose such information, his solicitation of RBC on behalf of EP could give rise to a good faith claim of a CUTSA violation. The court did not resolve this aspect of the CUTSA claim, however, because it did not need to do so. The CUTSA claim premised upon the RBC solicitation was colorable. That the conduct, for the reasons articulated above, could not be the basis for an award of damages or the granting of injunctive relief, does not alter this conclusion. Losing on the merits for these reasons, does not make the claim without color at the time it is brought or tried.

"Whether or not the CUTSA claim was colorable at the outset, portions of it became objectively specious shortly into the discovery process. [The plaintiff]'s per-

sistence in maintaining certain of these CUTSA claims, to include those which it dropped before trial and one which it brought to trial (the box), was motivated by improper purposes." (Footnotes altered.)

On appeal, the plaintiff challenges the court's bad faith determination on the grounds that the court "completely misapprehend[ed] [its] concerns relating to EP's ability to customize its products after Bergmann left [its employ] and joined EP in 2010" and "ignore[d]" certain facts regarding EP's product upgrades. (Emphasis omitted.) The plaintiff's arguments in this regard are belied by the trial court's thorough decision addressing those very issues. The record supports the trial court's determination and it is not the role of this court to retry those issues.[10] We thus reject the plaintiff's contention that the trial court's bad faith determination was erroneous.

V

The plaintiff finally claims that the trial court erred in awarding attorney's fees to EP on the basis of its finding of bad faith against the plaintiff without apportioning that award to only the claims found to have been made in bad faith. We disagree.

At the conclusion of its October 16, 2014 memorandum of decision, the court directed the parties to contact the court officer to schedule a hearing on the defendants' request for attorney's fees. On March 6, 2015, EP filed a motion for attorney's fees, costs and postjudgment interest pursuant to § 35-54. The court held a hearing on that motion on March 16, 2015. Although the plaintiff did not file a written objection to EP's motion prior to the hearing, its counsel expressed at the hearing that it objected to the motion and that it assumed that the hearing would be evidentiary. Counsel for the plaintiff also requested permission to file a memorandum in opposition to EP's motion after the hearing. The court stated: "Well, to the extent that either side wants to put on evidence, I'm certainly going to permit that." The court also indicated that it would permit the plaintiff to file a memorandum following the hearing. The court then asked counsel for EP to proceed on his motion. Counsel for EP indicated to the court that it was relying as evidence for its claim for attorney's fees the affidavits that he had attached to his March 6, 2015 motion. Those affidavits were marked by the court as defendants' exhibit A. By way of objection to the amount of attorney's fees requested by EP, the plaintiff argued that certain of the time billed by counsel for EP should be segregated out of their bill because it did not concern the claims that the trial court had determined were maintained in bad faith. Upon inquiry by the court, the plaintiff agreed that the court should look at the billing records from February, 2013, up "to the time of trial and make a reduction because the product technology was off the table during that

time period . . . ." Following its argument that certain billing should be excised by way of timing, the court asked, "Anything further by way of . . . putting me on notice of what you anticipate challenging from a factual standpoint, or a legal argument you'd like to present?" The plaintiff responded only that it did not believe that EP's claim for costs were appropriate under the law, and stated that it would brief that argument fully. The court advised counsel that once it received all of the parties' posthearing filings, it would assess "whether [it could] take it on the papers or whether [it would] need to bring everybody back in." Counsel for the defendant thanked the court and the court set a briefing schedule, after which it stated, consistent with its earlier statement: "And I will review everything that is submitted, and I will decide at that point whether I can resolve the question of award on papers, or whether I need to bring you back. If, having reviewed each other's submissions, you think one way or the other, then you should communicate to [the court officer] whether the court can take it on the papers or you feel strongly that you want to come back. As I said, I'll have your input on that, and ultimately I will decide whether I take it on the papers."

On April 7, 2015, the plaintiff filed an objection to EP's motion for attorney's fees, costs and interest, in which it stated: "The issue for the court's determination now is the reasonableness of [EP]'s request for attorney's fees for the plaintiff's maintenance of claims of misappropriation of the plaintiff's product technology and box design after 2011." The plaintiff argued, inter alia, that EP's claimed amount of attorney's fees failed to properly apportion the amount of time spent on the claims that the court found to have been pursued in bad faith, versus its colorable claims, and posited that the appropriate award of attorney's fees, after proper apportionment, would be $60,998.70. The plaintiff also objected to EP's counsel billing their full hourly rate for time spent traveling as unreasonable.[11]

In response to the plaintiff's objection, EP argued that the plaintiff's calculation of attorney's fees was based upon the incorrect premise that if a billable item involves both a colorable claim and a bad faith claim, then it cannot be recovered. EP argued to the contrary—that the plaintiff's colorable claims and bad faith claims were so intertwined that they could not be separated. The plaintiff filed a surreply to EP's response, and EP filed a reply to the plaintiff's surreply, wherein both parties reiterated their respective positions on the apportionment of fees between colorable claims and those made in bad faith. Nowhere in any of those posthearing filings did either party request an evidentiary hearing before the court.[12]

On May 21, 2015, the court issued an order in which it concluded that "it would be impossible, due to the

intertwined nature of the CUTSA claims with the tort claims, as well as the intertwined nature of both the colorable and noncolorable CUTSA claims, to attempt to segregate out specific invoice entries or apportion only some of the fees to the CUTSA claim brought in bad faith." The court thus awarded attorney's fees in the amount of $171,203.40, which was the amount requested by EP, minus a 10 percent reduction to account for the "defense of the other causes of action and/or the colorable CUTSA claims . . . ."

On appeal, the plaintiff challenges the award of attorney's fees to the plaintiff on the grounds that EP failed to meet its burden of distinguishing between the plaintiff's colorable claims and those maintained in bad faith and apportioning the claimed fees accordingly, and that the court erred in accepting EP's allegedly unfounded contention that its defense of the plaintiff's colorable claims constituted "approximately 10 percent of the case."

"We review the reasonableness of the court's award of attorney's fees under the abuse of discretion standard. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of [the amount of attorney's fees awarded] is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion it did. . . . A court has few duties of a more delicate nature than that of fixing counsel fees. The issue grows even more delicate on appeal . . . for the trial court is in the best position to evaluate the circumstances of each case." (Internal quotation marks omitted.) *East Windsor* v. *East Windsor Housing, Ltd., LLC*, 150 Conn. App. 268, 275, 92 A.3d 955 (2014).

In issuing its award of attorney's fees to EP, the court relied upon our Supreme Court's decision in *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 63 A.3d 896 (2013), in which the court held: "[W]hen certain claims provide for a party's recovery of contractual attorney's fees but others do not, a party is nevertheless entitled to a full recovery of reasonable attorney's fees if an apportionment is impracticable because the claims arise from a common factual nucleus and are intertwined." Id., 333. In light of the trial court's determination that the plaintiff's claims were intertwined to the point that it would be impossible to separate them, we disagree, as did the trial court, with the plaintiff's contention that EP failed to meet its burden of distinguishing between the plaintiff's colorable claims and those maintained in bad faith. The court was free to accept or reject EP's contention that its defense of the plaintiff's colorable claims accounted for only 10 percent of the claimed fees and properly exercised its

discretion in fashioning its award of attorney's fees to EP.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] As a preliminary matter, the trial court explained: "The court does not attempt to include in this decision all of the evidence relied upon in the court's factual findings. The court has considered all of the evidence admitted, and the reference to any subset of the evidence presented should not be construed as identifying the exclusive basis for the court's ruling. Neither should the court's failure to identify or mention specific evidence give rise to an inference that such evidence has not been considered."

[2] The trial court noted: "Given [the plaintiff]'s access to this information, and the additional evidence offered by the defendants as to EP's relative capabilities and products through the years, Akerman's testimony that he believed that EP could not perform customizations, and that EP did not have board games in its inventory is not credible."

[3] The court explained: "[The plaintiff] also asserts that EP misappropriated its pricing strategies and information. [The plaintiff] adduced little if any evidence from which such a finding might be made. The court does not herein further address this claim. [The plaintiff] claims EP and Bergmann misappropriated client lists. [The plaintiff] offers no evidence of such a claim, with the possible exception of RBC, which was, at best, a potential future client. Bergmann testified he did not take any lists, and Wells testified that Bergmann did not provide any lists. This testimony was credited. The court does not herein further address this claim. [The plaintiff] also asserts that EP and Bergmann misappropriated, used and disseminated [the plaintiff's] 'confidential information.' Aside from the claims addressed above, [the plaintiff] offers no evidence from which such a finding could be made. The court does not herein further address this claim. Indeed, [the plaintiff] continues to make broad, sweeping allegations of wrongdoing by EP even though the evidence at trial as to such sweeping allegations was utterly lacking."

[4] The court further noted: "The plaintiff's case relies largely on the testimony of Jonas Akerman, who presented on many issues, as not credible. The court observed Mr. Akerman's unwillingness to let go of beliefs or suspicions which were concededly based upon false premises. He offered testimony on 'facts' only to have those same 'facts' to be revealed as his personal opinion, for which no corroborating evidence was offered. He was unreasonably intransigent when confronted with contrary evidence. His testimony was often refuted by other witnesses as well as the documentary evidence submitted. He was evasive and defensive. At times, his testimony was simply inexplicable."

[5] The court denied EP's claim for costs on the ground that § 35-54 does not provide for such an award. The court also awarded postjudgment interest at the rate of 5 percent per annum. Neither of those orders is challenged on appeal.

[6] The plaintiff also sought clarification as to an order requiring the defendants to disclose their expert. That portion of the court's order is not relevant to the claims on appeal.

[7] The plaintiff also argues for the first time in its reply brief to this court that the trial court applied the incorrect legal standard to its bad faith determination. It is well settled that this court does not address claims raised for the first time in a reply brief.

[8] The trial court noted: "At trial, [the plaintiff] produced, for the first time, a page from a multipage document which was prepared by [the plaintiff]'s financial advisors during the 2008 due diligence. It is a one page summary which encapsulates the advisor's assessment of EP and the viability of an acquisition. The one page summary does not include any mention of EP's capacity to customize its product to suit the needs of its clients. Akerman testified that this is a document on which he relied in coming to his belief that EP had lost its previous ability to customize until after Bergmann was hired. However, the document itself was part of a bigger document which included a second page containing a fair amount of information on EP's customization capacity. [The] plaintiff's effort to bolster what the court has found to be false testimony with an incomplete and misleading document is troubling. While this court does not go so far as to conclude that Akerman sought to mislead the court by withholding the second page, it does appear to this court that he was trying to bolster his own false statement that he

did not believe EP had a high level of customization capability."

[9] "The plaintiff also sought: a list of current and former clients; a description of which products were sold to which clients; and other clearly protected trade secret information."

[10] The plaintiff also claims on appeal that the trial court improperly determined that it had made a claim of misappropriation of the "Conductor" box itself. The plaintiff argues that its claim concerning the box concerned only the identity of the designer of the box. A reading of the plaintiff's brief to this court, in which it cites its own posttrial brief to the trial court belies this argument. As the plaintiff stated in its brief to this court: "In its posttrial memorandum, the plaintiff argued that 'the unique design of [its] Conductor box, including who makes it and how,' were trade secrets as defined under CUTSA."

[11] The plaintiff also challenged EP's request for costs and postjudgment interest. The court did not award costs and although it did award postjudgment interest, the plaintiff has not challenged that award on appeal.

[12] The plaintiff claims that the trial court erred in denying its request for an evidentiary hearing. Our review of the record reveals that this is a misrepresentation of the proceedings that occurred before the trial court. Although counsel for the plaintiff suggested a desire to cross-examine counsel for EP as to the reasonableness of the claimed fees, he was unable, upon inquiry by the court, to articulate a basis for such an examination, and, instead, challenged the apportionment of the billing between the colorable and the bad faith claims. Counsel for the plaintiff indicated to the court that he would fully address that argument in his posthearing brief. The court indicated to counsel for both parties that if either of them wanted to come back for an evidentiary hearing following the posthearing briefing, to so indicate to the court or the court would consider the issue on the papers. Neither party made such a request. The quoted portions of the hearing that are cited herein, in addition to the fact that neither party requested an evidentiary hearing in their posthearing briefs, belie the plaintiff's claim that the trial court denied its request for such an opportunity.

———————————————