******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES W. ROCKWELL, JR. *v.* DONATE S.
ROCKWELL ET AL.
(AC 38512)

Lavine, Elgo and Bear, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant attorney, C, for
vexatious litigation in connection with a breach of contract action
against the plaintiff that had been commenced by C on behalf of the
plaintiff's former wife, D. That action concerned an agreement between
the plaintiff and D pursuant to which D had agreed to invest in certain
unspecified securities, which were held in an investment account man-
aged exclusively by the plaintiff. In return, the plaintiff guaranteed repay-
ment of D's total investment amount upon the liquidation of the account,
taking into consideration all prior transactions involving the account.
On multiple occasions prior to the liquidation of the investment account,
D received distributions to pay capital gains taxes on the account. When
the account was liquidated, D received some proceeds from the account,
and she contacted the plaintiff requesting further payment in accordance
with the agreement. The plaintiff thereafter tendered to D a payment
of $4000. C then filed an application for a prejudgment remedy on D's
behalf. The trial court denied the application, but noted on the record that
the breach of contract issue was appropriate for litigation. Thereafter,
C commenced a breach of contract action on D's behalf. The trial court
denied the plaintiff's motion for summary judgment, in which he claimed
that D had received an amount in excess of that guaranteed under the
agreement through her withdrawals from the investment account related
to the payment of capital gains taxes. After a trial, the jury returned a
verdict in favor of the plaintiff, and the court rendered judgment in
accordance with the verdict. The plaintiff then brought this vexatious
litigation action claiming, inter alia, that C had commenced the breach
of contract action without probable cause and with malicious intent.
The plaintiff elected a jury trial, and, on the first day of the trial, C
moved to bifurcate the issue of probable cause for trial to the court,
which denied the motion. Thereafter, the trial was delayed a number
of times for various reasons caused by the plaintiff, and C requested
that the court reconsider his motion to bifurcate. When the trial resumed,
the court discharged the jury because three of the eight jurors indicated
that it would be a severe hardship for them to serve on the jury the
following week, and C did not assent to continuing the trial with only
five jurors. The trial court then, on reconsideration, granted C's motion
to bifurcate. Following a hearing, the trial court found that C had proba-
ble cause to commence the breach of contact action and rendered
judgment in favor of C, from which the plaintiff appealed to this
court. *Held*:

1. The trial court did not abuse its discretion in bifurcating trial of the issue
   of probable cause from the issues of malice and damages; the record
   revealed that the court's decision to bifurcate came after a period of
   significant delay caused solely by the plaintiff, which resulted in the
   discharge of the jury originally empaneled to hear the matter, and that
   the court's exercise of discretion in initially denying, and then later
   granting, C's motion to bifurcate the proceeding was prompted by inter-
   ests of judicial economy, convenience, and negation of prejudice to the
   parties, and the resolution of the probable cause issue in C's favor
   obviated the need to litigate the issues of malice and damages.
2. The plaintiff could not prevail on his claim that the trial court, in deciding
   the issue of probable cause, violated his state constitutional right to a
   jury trial: the plaintiff failed to provide this court with a complete analysis
   of the factors set forth in *State* v. *Geisler* (222 Conn. 672), both this
   court and our Supreme Court have, in such cases, declined to review
   claims predicated on our state constitution, and the plaintiff's claim to
   an absolute right to have the issue of probable cause decided exclusively
   by a jury could not be reconciled with the ample body of Connecticut
   precedent, to which this court was bound to follow, holding that the

existence of probable cause is a question of law to be decided by a court; moreover, although, in the vexatious litigation context, when the facts are disputed the court may submit the issue of probable cause to a jury as a mixed question of fact and law, whether the facts are sufficient to establish the lack of probable cause is a question ultimately to be determined by the court, and when the facts relevant to the inquiry into the objective reasonableness of a litigant's belief in the validity of the claim asserted are not in dispute, the trial court properly may decide the question of probable cause without the aid of the jury.

3. The trial court properly concluded that the plaintiff failed to meet his burden of proving that C lacked probable cause to prosecute the breach of contract action; the record contained undisputed facts known by C when the action was instituted on which a reasonable attorney familiar with Connecticut law would have believed that lawful grounds for prosecuting the breach of contract action existed, as those facts indicated that a legitimate factual dispute warranting adjudication existed between the plaintiff and D as to whether the distributions to D from the investment account that were used to pay capital gains taxes constituted prior transactions that were to be included in the calculus of the guarantee provisions of the agreement, and, thus, as to whether D had received from the account an amount in excess of that which the plaintiff had guaranteed under the agreement.

Argued September 12—officially released December 5, 2017

*Procedural History*

Action to recover damages for vexatious litigation, and for other relief, brought to the Superior Court in the judicial district of Ansonia-Milford, where the court, *Stevens, J.*, granted the named defendant's motion to dismiss the action as against her; thereafter, the court granted the defendant Ian A. Cole's motion to bifurcate; subsequently, the matter was tried to the court; judgment for the defendant Ian A. Cole, from which the plaintiff appealed to this court. *Affirmed.*

*James W. Rockwell, Jr.*, self-represented, the appellant (plaintiff).

*Raymond J. Plouffe, Jr.*, for the appellee (defendant Ian A. Cole).

*Opinion*

ELGO, J. In this vexatious litigation action, the self-represented plaintiff, James W. Rockwell, Jr., appeals from the judgment of the trial court rendered in favor of the defendant Attorney Ian A. Cole.[1] On appeal, the plaintiff claims that the court (1) improperly bifurcated trial of the issue of probable cause from the issues of malice and damages, (2) violated his right to a jury trial and (3) improperly determined that the defendant had probable cause to prosecute the underlying action. We disagree and, accordingly, affirm the judgment of the trial court.

The genesis of the present dispute is a breach of contract action commenced in 2009 (2009 action) by the plaintiff's former spouse, Donate S. Rockwell (Donate). The 2009 action concerned a written agreement between the plaintiff and Donate (agreement), which states that they "have entered into a joint venture for the purchase of certain securities." Pursuant thereto, Donate agreed to invest $22,104.50 in unspecified securities, which were held in an investment account managed exclusively by the plaintiff.[2] The plaintiff, in turn, agreed to "guarantee the total investment amount to [Donate]."[3] That notarized agreement was drafted by the plaintiff's representative and was signed by the plaintiff and Donate.

At all relevant times, the defendant appeared as legal counsel for Donate in the 2009 action. Following an initial consultation with her, the defendant sent a demand letter to the plaintiff dated December 3, 2008, in which he requested payment of approximately $18,000 that allegedly was due and owing to Donate pursuant to the agreement. The defendant never received a response from the plaintiff.

Seven weeks later, the defendant filed an application for a prejudgment remedy on Donate's behalf. The court, *Tyma*, *J.*, held a hearing on that application, which focused in large part on distributions from the investment account made prior to its liquidation in 2007. At that time, the plaintiff[4] introduced into evidence certain financial records from Donate's investment account, which he had subpoenaed. In her testimony, Donate acknowledged that, on multiple occasions prior to liquidation, she received distributions to make capital gains tax payments associated with the investment account, including a payment of "$18,000 at one point." Because the relevant provisions of the agreement required the parties to take "into account all prior transactions involving the Investment"; see footnote 3 of this opinion; the plaintiff testified that, in his view, the term "prior transaction" included any distribution from the investment account. He thus argued that the financial records before the court indicated that Donate had received "more than her initial money back." The defen-

dant disagreed, arguing that the distributions in question were not proceeds applicable to the guarantee provisions of the agreement but, rather, were distributions for capital gains taxes on the investment account. The court ultimately denied the application for a prejudgment remedy. In so doing, the court remarked that although the granting of prejudgment relief was not warranted, the breach of contract issue was "appropriate for litigation."

The defendant thereafter commenced the 2009 action against the plaintiff on behalf of Donate. Her one count complaint alleged in relevant part: "On or about March 8, 1994, the [plaintiff], in order to induce [Donate] to invest $22,104.50 in a joint investment with him, guaranteed repayment to [Donate] of her entire investment of $22,104.50. . . . In reliance upon said guarantee, [Donate] invested with the [plaintiff] the sum of $22,104.50. . . . The guarantee provided, in pertinent part, that upon complete sale or liquidation of the investment, if the value realized was less than $22,104.50 then the [plaintiff] would pay to [Donate] 'the entire value of the investment, plus an additional amount sufficient to provide her with the total amount of $22,104.00' . . . . The investment was liquidated on or about July 17, 2007 . . . ." Upon liquidation, the complaint alleged that Donate received $1190.60 in proceeds. The complaint further alleged that, one day later, the plaintiff made a "partial payment" of $4000 to Donate in response to her request that he "honor the [agreement]," but thereafter refused to pay the $16,913.90 "balance due [to Donate] under the terms of the [agreement]." Appended to the complaint was a copy of the agreement.

Following a period of discovery, the plaintiff filed a motion for summary judgment, claiming that "[t]he total amount withdrawn by [Donate] from the Investment was $45,495.90, an amount in excess of the amount [the plaintiff] guaranteed she would receive from the Investment." The court, *Hiller, J.*, denied that motion.

A jury trial was held in 2010, at which both the plaintiff and Donate testified. In addition, the jury was presented with documentary evidence from both parties. When the trial concluded, the jury returned a verdict in favor of the plaintiff.[5] The court then rendered judgment in favor of the plaintiff in accordance with that verdict.

In 2013, the plaintiff, now self-represented, commenced the present vexatious litigation action. His complaint alleged in relevant part that the defendant, in his capacity as legal counsel to Donate, "commenced and prosecuted" the 2009 action "without probable cause and with malicious intent to unjustly vex and trouble the [plaintiff]." His prayer for relief sought compensatory damages and treble damages pursuant to General Statutes § 52-568. In his answer, the defendant denied the substance of those allegations. The defendant also filed

a special defense, in which he averred in relevant part that "[t]here was probable cause to commence the underlying suit to determine the meaning and effect of disputed contractual guarantee language . . . ." On December 2, 2014, the plaintiff filed a certificate of closed pleadings with the trial court, in which he claimed a jury trial.

A jury was selected and a trial was scheduled for May, 2015. On the first day of trial, the plaintiff filed a request for a one week continuance, which the court denied. At that time, the court, *Stevens*, *J.*, explained to the plaintiff that "[t]his trial date has been outstanding for a significant period of time. You have proceeded to pick a jury which is now ready to proceed, and if this case is going to be continued . . . it probably will have to be continued for a month or two in order to accommodate the scheduling."

The court then turned its attention to the defendant's "motion to bifurcate the issue of probable cause for trial to the court," in which the defendant argued that the issue of whether probable cause exists is always a question of law for the court to decide. In denying that request, the court noted that "the most prudent and effective use of judicial resources and economy is for the case to be tried to the jury and then for the court to address the issue as it may be presented by the parties at the end of the evidence."

The court then asked the plaintiff which witness he would be calling first. When the plaintiff stated that his first witness would not be present that day, the court responded: "Well, if they're not going to be here today then we can't hear them today, so what witness are you going to call next? They'll have to appear tomorrow. And if they are not going to be here this week then they will not be heard because this case is not going to be continued to accommodate an absent witness in this case in light of the scheduling issues that I've already articulated." When the plaintiff indicated that "[t]he other witnesses that I subpoenaed are not here," the court stated: "Well again, Mr. Rockwell, I appreciate that you are representing yourself, but in order for this case to proceed you're going to put on some evidence. Now either you're going to have to testify, you're going to have somebody else to testify, we're going to have to hear some evidence. . . . This case has been scheduled for some time to start today. You were aware of the fact that this case was scheduled to start today some time ago, and as a result you are required to do what you need to do in order to have witnesses here." When the court then asked who the first witness would be, the plaintiff asked for "a recess until 2 p.m." because he had "left [his] papers at home . . . ." The court then inquired as to whether the plaintiff could at least make an opening statement, to which the plaintiff indicated that he had "left it at home."

At that time, the court advised the plaintiff as follows: "Listen to me very carefully. This case has been scheduled for trial today for some time now. As the plaintiff, you are required to be prepared to present whatever you want to present to the jurors today and tomorrow. That requires you to be prepared to make whatever presentations or arguments that you want to make to the juror[s] as part of opening statements. You have to be prepared today and tomorrow to offer whatever documents you want the jurors to consider. You have to be prepared to offer whatever witnesses you want to call. You have to do that today and tomorrow. I appreciate that you are representing yourself . . . but it does not provide an excuse for not complying with the law and the rules and procedures of this court. They apply to you whether you are represented by an attorney or not. We can try to accommodate you as the law permits and as procedure allows, but you're still going to have to put on your case. . . . And you have today and tomorrow to do it." The court then recessed the case until 2 p.m.

When court resumed that afternoon, the plaintiff made an opening statement. He then called Donate as a witness, repeatedly asking her whether she had made certain withdrawals from the investment account created pursuant to the agreement. In her testimony, Donate insisted that she "didn't withdraw anything out of that account." With respect to approximately $45,000 in distributions that she received from the investment account prior to its liquidation, Donate testified that she "didn't withdraw anything. It was paid for taxes." When the plaintiff then asked who paid those taxes, Donate responded, "You did, and you also called my tax person every time, every year, and day you handled something." Donate further testified that, on November 5, 2008, she told the defendant that the only proceeds that she ever received from the investment account was $1165.90. Later in her testimony, the plaintiff asked the court for a recess, which the court granted. Following that recess, the plaintiff requested additional time to "take care of a medical problem." The court promptly adjourned the proceeding for the day, advising the jurors that the case would resume at 9:30 a.m. the next day.

When the proceeding resumed the following day, the plaintiff was not present. The court noted for the record that the clerk's office had received a telephone call from the plaintiff's wife, who indicated that the plaintiff woke up not feeling well and, therefore, was taken to a hospital. As a result, the court excused the jury for the day. At that time, the court expressed its concern as to the availability of jurors moving forward, stating: "[T]he jurors when they were impaneled last week were advised that the case—that the schedule of the case in terms of their commitment was going to involve their

time through Friday of this week. Well, it's apparent that this case is not going to be finished this week, so one of the things we do need to do is address with the jurors their schedule and confirm that they are available next week. Looking at the witness list and the rate at which we went yesterday, I am seriously concerned about whether or not we can be done next week either, but that would be the goal." Given those circumstances, the defendant asked the court to "please reconsider my earlier motion to bifurcate," opining that "to convert this to an evidentiary hearing on probable cause . . . would fairly balance the interests of the defendant . . . who is the sole defendant in this case." In response, the court advised the defendant that it would not address that request without the plaintiff present. Rather, the court noted that the plaintiff "will be here tomorrow, and with his presence we can revisit these issues which you would like the court to address . . . ."

The following day was Thursday, May 14, 2015. The plaintiff, who was present in court that morning, furnished a doctor's note asking the court to excuse him from any proceedings over the next three days. In response, the defendant renewed his request that the court reconsider its ruling on the motion to bifurcate. After taking that request under advisement, the court noted certain "procedural issues" stemming from the continuance proposed by the plaintiff's doctor. The court remarked, and the plaintiff confirmed, that when the jury was empaneled, it was "told that [its] time commitment would be this week." The court then brought in the jurors and inquired as to their availability the following week and whether "having to be in court for those days . . . would create a severe conflict, problem, or hardship for any of [them] for any reason . . . ." Three of the eight jurors so indicated. Although the plaintiff subsequently assented to continuing with only five jurors, the defendant declined to do so. As a result, the court proceeded to discharge the jury.[6]

The court then returned its attention to the defendant's motion to bifurcate, explaining that "[o]ne of the reasons I [originally] was disinclined to entertain the motion to bifurcate was judicial economy. The jury had been picked. Put the evidence on . . . before me and the jury once and be done. That was one of the reasons I denied it although it may not have been expressly articulated that way. I just used the phrase judicial economy and efficiency. But again, the situation now is quite different because of the delays we've had this week and the continued delay we're going to have as the result of the plaintiff's present request [for a three day continuance]." The court continued: "[W]hen the motion for bifurcation was first presented to me, it was after the jury had been empaneled. The parties were already engaged in jury selection and the jurors were here ready to hear evidence. At that time it seemed to

be most prudent and efficient for the evidence to proceed for the jurors. . . . As we sit here today the procedural situation is qualitatively different. You folks do not have a jury now because of the circumstances which have been presented, and in order to acquire one you're going to have to go through jury selection again. That being the case, I'm of the view that I have now heard some of the evidence, it does make sense at this point for me to now hear whatever other evidence that the parties may need to present on the probable cause issue. And if the case can be resolved on the basis of that, then it will be resolved on the basis of that. And for whatever reason either factual or legal the matter cannot be resolved on the basis of that, then the parties will then be in the position that they will need to take the time and expense to go through jury selection again. But since it is now possible that the jury selection process may be obviated by the court hearing this preliminary issue of probable cause, the court is going to now reverse its decision denying the motion to bifurcate through the granting of the oral request for reconsideration, and the court is going to order that there be bifurcation."[7]

The court held a hearing on the issue of probable cause over the course of three days, at which the parties submitted testimonial and documentary evidence. The parties thereafter submitted posthearing briefs to the court. In a memorandum of decision dated October 14, 2015, the court found that probable cause existed to commence the 2009 action and, therefore, rendered judgment in favor of the defendant. From that judgment, the plaintiff now appeals.

## I

We first consider the propriety of the court's decision to bifurcate this civil proceeding. It is well established that the trial court is vested with discretion to bifurcate a civil trial. "Pursuant to General Statutes § 52-205[8] and Practice Book § 15-1,[9] the trial court may order that one or more issues that are joined be tried before the others. The interests served by bifurcated trials are convenience, negation of prejudice and judicial efficiency. . . . Bifurcation may be appropriate in cases in which litigation of one issue may obviate the need to litigate another issue. . . . The bifurcation of trial proceedings lies solely within the discretion of the trial court." (Citation omitted; footnotes in original; internal quotation marks omitted.) *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 448–49, 820 A.2d 258 (2003). When a trial court exercises its discretion to bifurcate a civil trial, "appellate review is limited to a determination of whether this discretion has been abused. . . . In reviewing claims that the trial court abused its discretion [in bifurcating certain issues at trial] the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should

be given in favor of its correctness; the ultimate issue is whether the court could reasonably conclude as it did . . . ." (Citation omitted; internal quotation marks omitted.) *Saczynski* v. *Saczynski*, 109 Conn. App. 426, 428, 951 A.2d 670 (2008).

The record before us reveals no abuse of the court's discretion. Its decision to bifurcate came after a period of significant delay caused solely by the plaintiff, which resulted in the discharge of the jury originally empaneled to hear the matter. As the transcripts plainly reflect, the court's exercise of discretion in initially denying, and then later granting, the defendant's motion to bifurcate the proceeding was animated by interests of judicial economy, convenience, and negation of prejudice to the parties. See *Reichhold Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, 243 Conn. 401, 423, 426, 703 A.2d 1132 (1997). Furthermore, resolution of the probable cause issue in the defendant's favor in a vexatious litigation action obviates the need to litigate the issues of malice and damages. See id. ("[b]ifurcation may be appropriate in cases in which litigation of one issue may obviate the need to litigate another issue"); see also *Verspyck* v. *Franco*, 274 Conn. 105, 113 n.8, 874 A.2d 249 (2005) (existence of probable cause is absolute protection from liability for vexatious litigation); *Schaeppi* v. *Unifund CCR Partners*, 161 Conn. App. 33, 36 n.1, 127 A.3d 304 ("[b]ecause we conclude that want of probable cause, an essential element of both statutory and common-law causes of action, is lacking, thereby defeating any claim of vexatious litigation, we need not determine whether the trial court properly found that the element of malice was not proved"), cert. denied, 320 Conn. 909, 128 A.3d 953 (2015). Under the circumstances of this case, we conclude that the court did not abuse its discretion in bifurcating the vexatious litigation proceeding.

II

The plaintiff also claims that the court, in deciding the issue of probable cause, violated his state constitutional right to a jury trial.[10] He contends that "a party in a vexatious litigation case . . . has an absolute right to a jury trial" on the probable cause issue pursuant to article first, § 19, of the Connecticut constitution.[11] For two distinct reasons, we disagree.

First, the plaintiff has not provided this court with an analysis of the factors set forth in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).[12] Rather, he addresses only its fifth factor.[13] In such instances, both our Supreme Court and this court have declined to review claims predicated on our state constitution. See, e.g., *State* v. *Nash*, 278 Conn. 620, 624 n.4, 899 A.2d 1 (2006) (declining review where "[t]he defendant has not recognized, nor has he applied the six *Geisler* factors"); *Aselton* v. *East Hartford*, 277 Conn. 120, 152–55, 890 A.2d 1250 (2006) (declining review because appel-

lant briefed only Connecticut and federal case law without addressing other *Geisler* factors); *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004) (declining review because appellant failed to analyze *Geisler* factors "separately and distinctly"), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Fisher*, 121 Conn. App. 335, 349 n.10, 995 A.2d 105 (2010) ("the analysis required by [*Geisler*] . . . is a prerequisite to asserting an independent claim under the state constitution").

Second, on a more fundamental level, the plaintiff's claim to an absolute right to have the issue of probable cause decided exclusively by a jury cannot be reconciled with the ample body of Connecticut precedent holding that the existence of probable cause is a question of law to be decided by the court. See, e.g., *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94, 912 A.2d 1019 (2007) ("the existence of probable cause is an absolute protection . . . and what facts, and whether particular facts, constitute probable cause is always a question of law" [internal quotation marks omitted]); *Brodrib* v. *Doberstein*, 107 Conn. 294, 296, 140 A. 483 (1928) (existence of probable cause "is always a question of law"); *Giannamore* v. *Shevchuk*, 108 Conn. App. 303, 312, 947 A.2d 1012 (2008) ("[t]he issue of probable cause . . . ultimately presents a question of law that must be determined by the court"). For that reason, the appellate courts of this state have upheld judgments rendered in favor of defendants in vexatious litigation actions in which the court rendered summary judgment as a matter of law; see *Lichaj* v. *Sconyers*, 163 Conn. App. 419, 428–29, 137 A.3d 26 (2016); *Hebrew Home & Hospital, Inc.* v. *Brewer*, 92 Conn. App. 762, 773, 886 A.2d 1248 (2005); as well as cases in which the court bifurcated the issue of probable cause, conducted an evidentiary hearing, and then concluded that probable cause existed. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 90–92.

The constitutional guarantee enshrined in article first, § 19, of the Connecticut constitution secures a litigant's right to have issues of fact decided by a jury. See, e.g., *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 498, 4 A.3d 288 (2010) ("[t]he plaintiffs also claim that they were denied their right to a jury trial on issues of fact under article first, § 19, of the Connecticut constitution"); *Donner* v. *Kearse*, 234 Conn. 660, 675, 662 A.2d 1269 (1995) (observing that "[a] statute that prohibited a jury from making factual determinations . . . would run afoul of [the] constitutional guarantee" contained in article first, § 19); *Bower* v. *D'Onfro*, 38 Conn. App. 685, 695–96, 663 A.2d 1061 (discussing "right to have questions of fact resolved by a jury" under state constitution and concluding that "there is no violation of the defendants' article one, § 19 rights because there was no interference with the

jury's fact-finding function"), cert. denied, 235 Conn. 911, 665 A.2d 606 (1995); *Rozbicki* v. *Huybrechts*, 22 Conn. App. 131, 133–34, 576 A.2d 178 (1990) ("[i]n Connecticut, the right to have issues of fact decided by a jury is rooted in article first, § 19"), aff'd, 218 Conn. 386, 589 A.2d 363 (1991). To be sure, our Supreme Court has observed, in the vexatious litigation context, that "when the facts themselves are disputed, the court *may* submit the issue of probable cause in the first instance to a jury as a mixed question of fact and law." (Emphasis added.) *DeLaurentis* v. *New Haven*, 220 Conn. 225, 252–53, 597 A.2d 807 (1991). The court nevertheless prefaced that observation by noting that "[w]hether the facts are sufficient to establish the lack of probable cause is a question ultimately to be determined by the court . . . ." Id., 252. Bound by that precedent, which this intermediate appellate court cannot reconsider, reevaluate, or overrule; see *Hartford Steam Boiler Inspection & Ins. Co.* v. *Underwriters at Lloyd's & Cos. Collective*, 121 Conn. App. 31, 48–49, 994 A.2d 262, cert. denied, 297 Conn. 918, 996 A.2d 277 (2010); we must reject the plaintiff's claim. When the facts relevant to the inquiry into the objective reasonableness of a litigant's belief in the validity of the claim asserted are not in dispute, the trial court properly may decide the question of probable cause without aid of the jury. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 112; *DeLaurentis* v. *New Haven*, supra, 252–53; *Cosgrove Development Co.* v. *Cafferty*, 179 Conn. 670, 671, 427 A.2d 841 (1980).

### III

The remaining question, then, is whether undisputed facts exist in the record on which the court could conclude that the defendant possessed probable cause to prosecute the 2009 action for breach of contract. At the outset, we note that, in an action for vexatious litigation, the burden rests with the plaintiff to prove that the defendant lacked probable cause to prosecute a prior action. *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 330, 994 A.2d 153 (2010); see also *Zenik* v. *O'Brien*, 137 Conn. 592, 597, 79 A.2d 769 (1951) ("[a]lthough want of probable cause is negative in character, the burden is upon the plaintiff to prove affirmatively . . . that the defendant had no reasonable ground" for commencing action).

"[T]he probable cause standard applied to a vexatious litigation action against a litigant is a purely objective one." *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 95. That standard is defined as "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in

the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. . . . Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the claim asserted." (Internal quotation marks omitted.) Id., 94–95. Our Supreme Court has described that standard as a "lower threshold of probable cause" that permits "attorneys and litigants to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." (Internal quotation marks omitted.) Id., 103–104. As the court emphasized, "[p]robable cause may be present even where a suit lacks merit." (Internal quotation marks omitted.) Id., 103.

The probable cause inquiry in the present case entails consideration of whether, on the basis of the facts known by the defendant at the time the action was filed, a reasonable attorney familiar with Connecticut law would have believed that probable cause existed to prosecute the 2009 action for breach of contract. See id., 104–105. It is well established that "[a]n action in contract is for the breach of a duty arising out of a contract . . . ." *Gazo* v. *Stamford*, 255 Conn. 245, 263, 765 A.2d 505 (2001). "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291, 87 A.3d 534 (2014).

The first two elements of that cause of action require little discussion. It is undisputed that the plaintiff and Donate entered into the agreement in 1994. That written agreement was signed by the parties and appended to the complaint in the 2009 action. It also is undisputed that Donate performed her obligation under the contract by tendering payment of $22,104.50—the "total investment amount" specified in that agreement. Her March 9, 1994 check in that amount was admitted into evidence. Furthermore, in his testimony at the prejudgment remedy hearing held on March 16, 2009, and at the probable cause hearing in the present case, the plaintiff acknowledged both the "authenticity" of the agreement and Donate's payment of $22,104.50 into the investment account.

The critical question, then, is whether the record contains undisputed facts on which the defendant reasonably could advance a claim that the plaintiff had breached the agreement to Donate's detriment. We agree with the trial court that the record contains such facts.

Donate testified at both the trial before the jury on May 12, 2015, and the probable cause hearing on May 19, 2015. She explained that, at the time that she retained his services, she provided the defendant with a copy of the agreement and informed him that she received

$1190.60 in proceeds when the investment account was liquidated. Donate testified that, following that liquidation, she contacted the plaintiff requesting further payment pursuant to the agreement. It is undisputed that the plaintiff thereafter tendered a payment of $4000 to Donate. The record contains both an audio recording and a transcript of a message left on Donate's voice mail, which features a brief conversation between the plaintiff and his wife, Veronica Rockwell.[14] In that message, Veronica states that "[t]his should not be happening" and then asks the plaintiff why he had "transferred $4000 to [Donate's] account?" The plaintiff replied, "She never lied to me before. You know maybe I did guarantee it for her." Donate testified that she provided a copy of that recording to the defendant.

Also admitted into evidence was a letter dated July 27, 2007, that Donate sent to the plaintiff. That letter states in relevant part: "Thank you for depositing $4000 to my . . . account. I really appreciate your effort to come true to your word. . . . I remain [hopeful] that you will overcome all obstacles and fulfill your obligation and promise to me." Donate sent the plaintiff a second letter dated August 23, 2007, which also was admitted into evidence. In that letter, Donate sought compensation for "the money you owe me" pursuant to the agreement. She further indicated that, should the plaintiff require any "more proof," he should contact their representative at Prudential Securities Incorporated (Prudential). At the probable cause hearing, Donate confirmed that she provided copies of those letters to the defendant.

In addition, Donate provided uncontroverted testimony that she provided the defendant with proof of significant capital gains tax payments made prior to the liquidation of the investment account. Copies of two checks that she gave to the defendant were admitted into evidence. The first was payable to the United States Treasury in the amount of $26,085; the second was payable to the Commissioner of Revenue Services for the state of Connecticut in the amount of $6762. In her testimony, Donate also confirmed that the complaint that the defendant subsequently drafted in the 2009 action accurately reflected the information that she had provided to him. Donate provided a sworn affidavit to that effect, which was admitted into evidence.

Upon commencement of the 2009 action, a hearing on Donate's application for a prejudgment remedy was held. At that hearing, Donate testified that, on multiple occasions prior to liquidation, she received distributions to pay capital gains taxes on the investment account, including a payment of $18,000. The plaintiff at that time presented certain financial records that he had subpoenaed from Prudential regarding the investment account, which indicated a total of $45,495 in distributions therefrom. Due to the parties' dispute as to

whether such distributions should constitute payments toward the guarantee provisions of the agreement, the court denied the application for a prejudgment remedy. At that time, the court noted on the record that the breach of contract issue nevertheless was "appropriate for litigation." The plaintiff was served with process in the 2009 action approximately one week later.

In his January 26, 2010 affidavit filed with the court, the plaintiff swore that "[t]he total amount withdrawn by [Donate] from the Investment was $45,495.90 . . . ." The plaintiff also filed a motion for summary judgment at that time, claiming that "[t]he total amount withdrawn by [Donate] from the Investment was $45,495.90, an amount in excess of the amount [the plaintiff] guaranteed she would receive from the Investment." The court denied that motion. In so doing, the court determined that a genuine issue of material fact existed as to whether Donate had received an amount in excess of that guaranteed under the agreement. Cf. *Lichaj* v. *Sconyers*, supra, 163 Conn. App. 423–24 and 426 n.5 (acknowledging that denial of motion for summary judgment is factor to consider in analysis of probable cause but expressing "no opinion as to whether a denial of a motion for summary judgment, without more, is sufficient to negate the lack of probable cause for the purpose of a subsequent action in vexatious litigation"); *Porous Media Corp.* v. *Pall Corp.*, 186 F.3d 1077, 1080 (8th Cir. 1999) (when trial court denies defendant's motion for summary judgment "it follows that there was probable cause for bringing the [cause of action]").

Furthermore, the record indicates that, prior to trial, the plaintiff filed a notice of compliance with the court's trial management order (notice). In that notice, the plaintiff provided an overview of the case, stating that "[t]here were many transactions during the thirteen years the investment account existed. [Donate] contends there is an amount due her. The [plaintiff] claims that [Donate] received $22,104 prior to the investment being liquidated . . . ." In addition, the plaintiff averred that the following issues were "not in dispute: From 1998 to 2005, [Donate] withdrew $45,495 from the account and paid capital gains taxes in the amount of $42,528." In addition, the plaintiff submitted proposed jury interrogatories to the court, which limited the alleged withdrawals made by Donate to a total of $44,330. The plaintiff also disclosed Anthony Annunziata, a certified public accountant, as an expert witness prior to trial. In his disclosure, the plaintiff stated that Annunziata was "expected to testify as to the income tax consequences of [Donate's] capital gains and losses." A trial on the 2009 action followed, though the defendant ultimately did not call Annunziata as a witness.

At the conclusion of trial, the court, *Radcliffe, J.*, held a charging conference with the parties. At that

time, the court indicated, that with respect to the breach of contract cause of action, it would charge the jury that "[Donate] claims that the phrase, 'taking into account all prior transactions involving the investment' refers to withdrawal of monies included in her initial capital investment of $22,104.50. She claims that no portion of the capital investment was withdrawn prior to the complete liquidation in July of 2007 when she received $1190.60. . . . The [plaintiff] on the other hand, claims that the phrase, 'taking into account all prior transactions involving the investment' includes . . . any withdrawals made by [Donate] over the years [including withdrawals] for the purpose of paying capital gains taxes, and withdrawals made for the personal use of [Donate]. The [plaintiff] claims that [Donate's] withdrawals exceeded $22,104.50, and that no monies are due under the contract . . . ." Both parties expressed their agreement with that instruction. After being so instructed by the court, the jury ultimately found in favor of the plaintiff.

The defendant testified at the probable cause hearing in the present case. He stated that he first learned of approximately $45,000 in distributions from the investment account at the March 16, 2009 prejudgment remedy hearing. As he testified, "that's when I discovered the subpoenaed records from [Prudential and] from [the plaintiff's] testimony that there was a claim that there were $45,000 [in] withdrawals which exceeded the $22,000." At the probable cause hearing, the plaintiff also questioned the defendant on the basis of his determination that there was probable cause to commence the 2009 action. In response, the defendant testified as follows: "[W]e had the subpoenaed account records [provided at the prejudgment remedy hearing], and we had that information which you claimed were withdrawals. We had the fact that you paid $4000 on account when she asked you to honor the agreement. . . . We also had testimony that there were huge capital gains taxes paid, so at that point the issue became what counts as a prior withdrawal or prior transaction because that's what it refers to. It's not defined in the agreement. My argument then and my argument at trial [in the 2009 action] was that all the withdrawals equal the capital gains taxes paid or became close then she didn't get her initial investment back, and that issue went to the jury, and that's what the [notice] said and that's what [the plaintiff's January 26, 2010] affidavit said. The withdrawals were $45,000. You agreed—you agreed that she had paid $43,000 in capital gains, so there was a very good argument she . . . didn't get her capital investment back. Withdrawals were used to pay taxes . . . ."

Later in the probable cause hearing, the plaintiff asked the defendant "what does the word 'prior transactions' mean in your mind?" The defendant replied, "It depends on what the parties consider—'prior transac-

tions' is a very ambiguous term. It certainly doesn't mean just withdrawals, and I think you'd have to take into account deposits. There's also a question of whether or not that included withdrawals that were to pay capital gains taxes which were caused by [the plaintiff's] trading in the account. And that's what we went to trial on. That's what went to the jury whether or not the capital gains taxes should be counted in this process. That was the [principal] issue that went to the jury." When the defendant was questioned about the notice that the plaintiff had filed with the court prior to trial, the defendant similarly testified that the notice indicated "these were the withdrawals, [$45,000]. These were the capital gains taxes paid. Those were undisputed facts in [the notice]. . . . So, the issue before the jury was whether or not payment of the capital gains should be considered . . . a credit or debit" under the agreement.

The defendant's uncontroverted testimony at the probable cause hearing is further evidence that a bona fide dispute existed as to whether the disbursements to Donate for payment of capital gains taxes should be considered "prior transactions" under the agreement. More importantly, the plaintiff produced no evidence indicating that the defendant lacked an objectively reasonable, good faith belief in the facts alleged and the validity of the claim asserted in the 2009 action. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 95. We reiterate that, in the context of vexatious litigation actions, the critical inquiry is not whether a plaintiff possessed a meritorious claim but, rather, a viable one. See id., 103–104 (noting that "[p]robable cause may be present even where a suit lacks merit" and explaining that "[t]he lower threshold of probable cause allows attorneys and litigants to present issues that are arguably correct, even if it is extremely unlikely that they will win" [citation omitted; internal quotation marks omitted]).

In his testimony at the probable cause hearing, the plaintiff acknowledged that he had represented to the court, at the March 16, 2009 prejudgment remedy hearing, in his January 26, 2010 affidavit, and in his January 26, 2010 motion for summary judgment, that the total amount of distributions that Donate received from the investment account was $45,495.90. When questioned about his attorney's representations to the court in moving for summary judgment, the plaintiff testified, "That's [what] he knew at the time . . . ." The plaintiff then was asked whether he had any evidence that the defendant "knew anything different than your attorney?" Significantly, the plaintiff conceded that "I have no evidence on that."[15]

In light of the foregoing, we concur with the trial court that a legitimate factual dispute warranting adjudication existed when the 2009 action was instituted—specifi-

cally, whether distributions from the investment account that were used to pay capital gains taxes constituted "prior transactions" that were to be included in the calculus of the guarantee provisions of the agreement. As was the case in *Lichaj* v. *Sconyers*, supra, 163 Conn. App. 427, "[r]egardless of how the issue ultimately would be resolved, the matter clearly and objectively required resolution, one way or another." We therefore conclude that, on the basis of the undisputed facts known by the defendant, a reasonable attorney familiar with Connecticut law would believe that lawful grounds for prosecuting the breach of contract action existed. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 101–105. Accordingly, the court properly concluded that the plaintiff had not met his burden of proving that the defendant lacked probable cause to prosecute the 2009 action.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Subsequent to the commencement of this action, the named defendant, Donate S. Rockwell, filed a motion to dismiss the action against her for lack of personal jurisdiction due to improper service of process, which the court granted. The plaintiff does not challenge the propriety of that judgment in this appeal. For purposes of clarity, we refer to Cole as the defendant in this opinion.

[2] Also admitted into evidence in the present case was a "Trading Authorization" with Prudential Securities Incorporated that Donate signed on April 9, 2000. That authorization named the plaintiff as her "true and lawful agent" and authorized him to manage the investment account in all respects.

[3] The agreement states in relevant part: "That upon the complete sale or liquidation of the Investment, if the total value of the entire Investment, taking into account all prior transactions involving the Investment, exceeds $22,104.00, then [Donate] shall receive the entire value of the Investment.

"That upon the complete sale or liquidation of the Investment, if the total value of the entire Investment, taking into account all prior transactions involving the Investment, is less than $22,104.00, then [the plaintiff] shall pay to [Donate] the entire value of the Investment, plus an additional amount sufficient to provide her [with] the total amount of $22,104.00.

"That it is the express intention of the parties that [the plaintiff] guarantee to [Donate] a full 100% return on her initial $22,104.00 contribution to the Investment and further that she shall be entitled to receive any increase in the Investment value."

[4] The plaintiff was represented by counsel throughout the 2009 action.

[5] The interrogatories completed by the jury indicate that it found that, prior to the liquidation of "the Investment," Donate received moneys from " 'prior transactions involving the Investment' equal to or greater than $20,913.90 . . . ."

[6] In his reply brief, the plaintiff asserts that the court improperly "failed to declare a mistrial." "It is well settled that this court does not address claims raised for the first time in a reply brief." *BTS, USA, Inc.* v. *Executive Perspectives, LLC*, 166 Conn. App. 474, 498 n.7, 142 A.3d 342, cert. denied, 323 Conn. 919, 150 A.3d 1149 (2016). Furthermore, the plaintiff has neither identified an applicable standard of review nor provided an analysis of relevant legal authority. "We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Mendez*, 154 Conn. App. 271, 275 n.2, 105 A.3d 917 (2014); see also *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 51 n.23, 861 A.2d 473 (2004) ("[i]nasmuch as the plaintiffs' briefing of the . . . issue constitutes an abstract assertion completely devoid of citation to legal authority or the appropriate standard of review, we exercise our discretion to decline to review this claim as inadequately briefed"). We therefore decline to review the merits of the abstract assertion contained in the plaintiff's reply brief. We do note, however, that such a claim implicates "the sound policy that courts are afforded wide latitude to redress potentially

harmful improprieties in order to avoid the drastic remedy of a mistrial." (Internal quotation marks omitted.) *State* v. *Rivera*, 152 Conn. App. 248, 259, 96 A.3d 1285, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014); accord *Hurley* v. *Heart Physicians*, *P.C.*, 298 Conn. 371, 393, 3 A.3d 892 (2010) ("[i]f curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided" [internal quotation marks omitted]).

[7] The plaintiff subsequently filed two motions to reargue the defendant's motion to bifurcate, which the court denied. In this appeal, the plaintiff alleges that the court improperly denied his second motion to reargue "without reading it" on May 19, 2012. The record plainly indicates otherwise. At the outset of the probable cause hearing on May 19, 2012, the plaintiff raised the issue of his second motion to reargue, and the court denied that motion. The following day, the plaintiff asked for permission to read his second motion to reargue into the record "[b]ecause I don't think you ruled on it . . . ." The court at that time explained to the plaintiff that "I did look at it. . . . What I did is that in order to confirm that I ruled on what I thought I saw, I asked the clerk to pull both of the motions that you filed, and I looked at both of them."

[8] General Statutes § 52-205 provides: "In all cases, whether entered upon the docket as jury cases or court cases, the court may order that one or more of the issues joined be tried before the others."

[9] Practice Book § 15-1 provides: "In all cases, whether entered upon the docket as jury cases or court cases, the judicial authority may order that one or more of the issues joined be tried before the others. Where the pleadings in an action present issues both of law and of fact, the issues of law must be tried first, unless the judicial authority otherwise directs. If some, but not all, of the issues in a cause are put to the jury, the remaining issue or issues shall be tried first, unless the judicial authority otherwise directs."

[10] In his principal appellate brief, the plaintiff states that he "makes no claims under the United States constitution . . . ."

[11] Article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

[12] The *Geisler* factors are: "(1) the 'textual' approach—consideration of the specific words in the constitution; (2) holdings and dicta of [the Connecticut Supreme Court] and the Appellate Court; (3) federal precedent; (4) the 'sibling' approach—examination of other states' decisions; (5) the 'historical' approach—including consideration of the historical constitutional setting and the debates of the framers; and (6) economic and sociological, or public policy, considerations." *State* v. *Linares*, 232 Conn. 345, 379, 655 A.2d 737 (1995).

[13] The plaintiff asserts that "because the tort of vexatious litigation, that existed, and was triable under the common law in 1818, at the time of the adoption of the Connecticut constitution, and was triable by a jury in the [c]ommon [l]aw of the colony of Connecticut and the [c]ommon [l]aw of England prior to 1818 . . . that [the plaintiff] is entitled, as a constitutional right, under article first, § 19, [of the] Connecticut constitution . . . to have a jury try the probable [cause] issue."

[14] Both the audio recording and the transcript of the voice mail message were admitted into evidence.

[15] Despite that admission, we note that the plaintiff at the probable cause hearing submitted certain documents that suggested that Donate received more than $45,495 in distributions from the investment account. In an affidavit dated April 15, 2014, the plaintiff averred in relevant part that "[t]he total amount withdrawn by [Donate] from the [i]nvestment account was $87,395.90, an amount in excess of the amount I guaranteed she would receive from the [i]nvestment." Also in evidence were numerous monthly statements from the account that were subpoenaed by the plaintiff in 2015, and an undated document titled "Money Earned by Donate Rockwell From Her Investment" that lists a series of withdrawals that Donate allegedly made from the investment account, which also totals $87,395.90. Although such evidence may establish that Donate's breach of contract claim lacked merit, those documents shed no light on the relevant probable cause inquiry with respect to *the defendant's* conduct in commencing the 2009 action.

We reiterate that the proper inquiry in a vexatious litigation action focuses on whether a reasonable attorney familiar with Connecticut law would believe, on the basis of the facts known by the defendant at the time that the action was commenced, that probable cause existed to prosecute the underlying action. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 104–105.

The plaintiff produced no evidence at the probable cause hearing that the defendant, prior to the trial in the 2009 action, was aware of any distributions beyond the $45,495 established at the prejudgment remedy hearing. The financial records produced at that hearing indicated that Donate had received $45,495 in distributions from the investment account prior to liquidation. Moreover, at the March 16, 2009 prejudgment remedy hearing, in his January 26, 2010 affidavit, and in his January 26, 2010 motion for summary judgment, the plaintiff and his counsel consistently represented that the total amount of distributions that Donate received from the investment account was $45,495.90. The court and the defendant were entitled to rely on those affirmations. See *State* v. *Smith*, 289 Conn. 598, 609, 960 A.2d 993 (2008) ("[i]t long has been the practice that a trial court may rely upon certain representations made to it by attorneys, who are officers of the court and bound to make truthful statements of fact or law to the court"); *Lettieri* v. *American Savings Bank*, 182 Conn. 1, 11, 437 A.2d 822 (1980) (party "was entitled to rely on the representation" of opposing counsel); *Lesser* v. *Altnacraig Convalescent Home, Inc.*, 144 Conn. 488, 491–92, 133 A.2d 908 (1957) ("[i]t is imperative that the court and opposing counsel be able to rely on the statement of issues as set forth in the pleadings").

In addition, the record contains evidence that the defendant reached out to the plaintiff's counsel prior to trial in the 2009 action to verify that the defendant had copies of all relevant financial records from the investment account. In his March 24, 2010 e-mail to the plaintiff's counsel, which was admitted into evidence in the present case, the defendant questioned whether the plaintiff had furnished copies of certain documents at the prejudgment remedy hearing, stating: "I am concerned that I do not have all the documents that you subpoenaed from Prudential. Are there any that you subpoenaed that you did not put into evidence at the [prejudgment remedy] hearing? Please advise." Days later, the plaintiff filed the notice with the court, in which he represented in relevant part that there was no dispute between the parties that Donate "withdrew $45,495 from the account and paid capital gains taxes in the amount of $42,528." The court understandably could rely on that factual representation, particularly because it was made in response to a trial management order. See *In re Natalie S.*, 325 Conn. 849, 857, 163 A.3d 1189 (2017) (because "none of the parties disputed these jurisdictional facts or otherwise attempted to challenge the representations made by counsel . . . the trial court was entitled to rely on these factual representations"); *Harp* v. *King*, 266 Conn. 747, 765 n.24, 835 A.2d 953 (2003) ("the record indicates that the facts . . . are undisputed and, further, that the parties expected the trial court to rely on the representations of counsel in regard to those relevant facts"). Likewise, a reasonable attorney familiar with Connecticut law would have relied on the plaintiff's representations to the court in prosecuting the 2009 action.

––––––––––––––––––––––––